IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RURAL & MIGRANT MINISTRY, INC., ALIANZA NACIONAL DE CAMPESINAS, EL COMITE DE APOYO A LOS TRABAJADORES AGRÍCOLAS, FARMWORKER ASSOCIATION OF FLORIDA, MIGRANT CLINICIANS NETWORK, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, RURAL COALITION, UNITED FARM WORKERS, UNITED FARM WORKERS FOUNDATION, <br><br>       Plaintiffs, <br><br>   v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and Andrew Wheeler, in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br>       Defendants. | Civil Action No. 1:20-cv-10645-LJL[1] |

**MEMORANDUM OF LAW IN SUPPORT OF PROPOSED ORDER TO SHOW CAUSE FOR EMERGENCY RELIEF PURSUANT TO FED. R. CIV. P. 65 AND 5 U.S.C. § 705**

---

[1] This case has been referred as potentially related to *New York et. al., v. U.S. Environmental Protection Agency,* No. 20-cv-10642, though a determination has not yet been made.

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ...........................................................................................................1

STATUTORY OVERVIEW ............................................................................................3

BACKGROUND .............................................................................................................4

    I.      AGRICULTURAL WORKER PROTECTION STANDARD AND
PROMULGATION OF THE AEZ.....................................................................4

    II.     AEZ ROLLBACK RULE...................................................................................8

STANDARD FOR ISSUANCE OF A TRO AND PRELIMINARY INJUNCTION
AND/OR A STAY OF THE EFFECTIVE DATE ......................................................10

ARGUMENT .................................................................................................................11

    I.      IF THE FINAL RULE GOES INTO EFFECT, THEN FARMWORKERS,
THEIR MEMBERS, AND OTHER BYSTANDERS WILL SUFFER
IRREPARABLE HARM. ................................................................................11

    II.     FARMWORKERS ARE LIKELY TO SUCCEED ON THE MERITS. ..............14

          A.     The Final Rule Violates FIFRA Because the AEZ Is Necessary to Prevent
Unreasonable Adverse Effects from Pesticides .........................................15

          B.     EPA Violated the APA by Failing to Engage in Reasoned Decision-
Making .....................................................................................................17

    III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR A TRO
AND/OR PRELIMINARY INJUNCTION OR STAY .........................................21

CONCLUSION..............................................................................................................24

# TABLE OF AUTHORITIES

**CASES**

**Page number(s)**

*Coronel v. Decker*,
    449 F. Supp. 3d 274 (S.D.N.Y. 2020)................................................................................11

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) .........................................................................................21

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).........................................................................................................18

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007)..............................................................................................11

*HarperCollins Publishers L.L.C. v. Gawker Media LLC*,
    721 F. Supp. 2d 303 (S.D.N.Y. 2010).............................................................................10

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*,
    596 F.2d 70 (2d Cir. 1979)..........................................................................................11–12

*Merrell v. Thomas*,
    608 F. Supp. 644, (D. Or. 1985) .......................................................................................3

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...........................................................................................................17

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980) ........................................................................................12

*Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*,
    438 F. Supp. 3d 220 (S.D.N.Y. 2020).............................................................................20

*New York v. U.S. Dep't of Educ.*,
    No. 20-CV-4260 (JGK), 2020 WL 4581595 (S.D.N.Y. Aug. 9, 2020)............................20

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)........................................................................................10, 23

*N.Y. State Pesticide Coal., Inc. v. Jorling*,
    874 F.2d 115 (2d Cir. 1989).............................................................................................3

*Organized Migrants in Cmty. Action, Inc. v. Brennan*,
    520 F.2d 1161 (D.C. Cir. 1975) ...................................................................3–4

**STATUTES**

5 U.S.C. § 500 *et seq.* ..........................................................................................1

5 U.S.C. § 705 ...........................................................................1, 3, 10, 24

5 U.S.C. § 706(2)(A) ...........................................................................................17

7 U.S.C. § 136 *et seq.* ..........................................................................................1

7 U.S.C. § 136(bb) ..........................................................................................3, 15

7 U.S.C. § 136a(a) ............................................................................................15

7 U.S.C. § 136a(c)(5)(D) .......................................................................................3

7 U.S.C. § 136n(b) ...........................................................................................15

**REGULATIONS & EXECUTIVE MATERIALS**

*Enforcing the Regulatory Reform Agenda*, Exec. Order No. 13,777, 82 Fed. Reg. 12,285
    (Feb. 24, 2017) ...........................................................................................19

40 C.F.R. § 170.210(a) ..........................................................................................6

40 C.F.R. § 170.405(a)(1)(i–iii) ............................................................................5

40 C.F.R. § 170.405(a)(2) ......................................................................................5

40 C.F.R. § 170.505(b). ........................................................................................5

Pesticides; Agricultural Worker Protection Standard Revisions,
    80 Fed. Reg. 67,496 (Nov. 2, 2015) ............................................... *passim*

Evaluation of Existing Regulations,
    82 Fed. Reg. 17,793-01 (Apr. 13, 2017) ..........................................19

Pesticides; Agricultural Worker Protection Standard; Revision of the Application Exclusion
    Zone Requirements, 85 Fed. Reg. 68,760-01 (Oct. 30, 2020) .......................... *passim*

**RULES OF COURT**

Fed. R. Civ. P. 65 ................................................................................1, 3, 24

**OTHER AUTHORITIES**

Comments of Alianza Naciónal de Campesinas, et al., Docket ID No. EPA-HQ-OPP-
   2017-0543-0136 (Jan. 30, 2020) ............................................... *passim*

Comments of the Child Labor Coalition, Docket ID No. EPA-HQ-OPP-2017-0543-0109
   (Jan. 27, 2020)................................................................................9

Comments of NASDA, Docket ID. No. EPA-HQ-OA-2017-0190-56233 (May 15, 2017)..........19

Comments of Richard Fenske, PhD, MPH, Docket ID No. EPA-HQ-OPP-2017-0543-0115
   (Jan. 29, 2020).............................................................................9, 16

Comments of Southern Migrant Legal Services, Docket ID No. EPA-HQ-OPP-2017-0543-
   0114 (Jan. 30, 2020).........................................................................9

Edward J. Kasner et al., *Gender Differences in Acute Pesticide-Related Illnesses and
   Injuries Among Farmworkers in the United States, 1998-2007*, 55 Am. J. Indus. Med.
   571 (2012) ...........................................................................7, 15, 16

Edward J. Kasner et al., *Spray Drift from a Conventional Axial Fan Airblast Sprayer in
   a Modern Orchard Work Environment*, 62 Annals Work Exposures & Health 1134
   (2018) .................................................................................8–9, 16

EPA, *Cost Analysis for Revisions to the Application Exclusion Zone in the Agricultural
   Worker Protection Standard; Final Rule* (October 2020)................................. *passim*

EPA, *Economic Analysis of the Agricultural Worker Protection Standard Revisions*,
   Docket ID No. EPA-HQ-OPP-2011-0184 .....................................................21, 23

EPA, Transcript of PPDC November 2, 2017 Meeting.........................................22–23

Geoffrey M. Calvert et al., *Acute Pesticide Poisoning Among Agricultural Workers in the
   United States, 1998-2005*, 51 Am. J. Indus. Med. 883 (2008)........................... *passim*

Magali N. Blanco et al., *Real-time Particle Monitoring of Pesticide Drift from an Axial
   Fan Airblast Orchard Sprayer*, 29 J. Exposure Sci. & Envtl. Epidemiology 397 (2019) ....9, 16

Soo-Jeong Lee et al., *Acute Pesticide Illnesses Associated with Off-Target Pesticide Drift
   from Agricultural Applications*, 119 Env't Health Persp. 1162 (2011) .........................7, 15, 16

## INTRODUCTION

Plaintiffs[2]—organizations representing farmworkers as well as rural communities across the United States—seek emergency relief prior to December 29, 2020, to maintain the status quo and prevent defendant United States Environmental Protection Agency (EPA) from implementing the newly promulgated rule: Pesticides; Agricultural Worker Protection Standard; Revision of the Application Exclusion Zone Requirements, 85 Fed. Reg. 68,760-01, 68,762 (Oct. 30, 2020) ("Final Rule"). The effective date of the Final Rule, which rolls back vital protections that safeguard farmworkers, their families, and agricultural communities from being exposed to pesticide spray drift, should be stayed pending judicial review pursuant to 5 U.S.C. § 705, or implementation should be temporarily restrained and preliminarily enjoined pursuant to Fed. R. Civ. P. 65 for the following reasons. *First*, Farmworkers and their members will suffer irreparable harm if the Final Rule is implemented. *Second*, Plaintiffs will likely succeed on the merits: the Final Rule violates (1) the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, because it fails to prevent unreasonable risks to human health and (2) the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, because it is an arbitrary and capricious reversal of EPA's prior policy. *Third*, other parties will face no adverse consequences if the Court stays the effective date. And *fourth*, the public interest favors maintaining the status quo pending litigation.

In 2015, after more than a decade of reviewing the adequacy of its rules to prevent farmworkers' occupational exposure to pesticides (known as the Agricultural Worker Protection

---

[2] Plaintiffs are Rural & Migrant Ministry, Inc., Alianza Nacional de Campesinas, El Comite de Apoyo a Los Trabajadores Agrícolas, Farmworker Association of Florida, Migrant Clinicians Network, Pineros y Campesinos Unidos del Noroeste, Rural Coalition, United Farm Workers, and United Farm Workers Foundation ("Plaintiffs" or "Farmworkers").

Standard ("WPS")), and finding mounting evidence that farmworkers and their families faced dangerous levels of exposure, EPA revised the WPS by adding a slate of new safeguards to shield farmworkers and community members from pesticide exposures. One of these new safeguards was the Application Exclusion Zone ("AEZ"), meant to address one of the most common causes of pesticide poisoning: exposure to pesticide spray drift during applications. The AEZ provision provides that during an active pesticide application, no person can be within a 100-foot radius (or 25-foot radius for certain applications) of the pesticide application equipment—whether that radius extends beyond the boundaries of the growing area or not. If someone is in the AEZ when a pesticide is being sprayed (other than a trained and equipped person involved in the pesticide application), the applicator must take a simple and common-sense step: suspend pesticide application immediately until the person has moved outside of the AEZ. This provision went fully into effect in January 2018, providing workers and bystanders long-awaited and needed protections from toxic exposures.

However, in October 2020, EPA published the Final Rule, significantly curtailing the protections of the AEZ. The Final Rule goes into effect on December 29. Absent relief from this Court, farmworkers and frontline communities nationwide will—in the middle of the COVID-19 pandemic—be at immediate increased risk of exposure to pesticides via drift. Farmworkers, their children, and community members who come into direct contact with pesticides as a result of this policy change could experience anything from mild symptoms to lifelong injury for which no remedy could ever be provided. In cavalierly casting aside the protections of the AEZ, EPA impermissibly ignored the robust record of research and data compiled during the earlier rulemaking process, which demonstrated that farmworkers and communities are not adequately protected against pesticide exposure without the AEZ.

Therefore, Plaintiffs ask the Court to provide a temporary restraining order and preliminarily enjoin implementation of the Final Rule without geographic limitation, Fed. R. Civ. P. 65, or in the alternative, stay the upcoming December 29, 2020, effective date of the Final Rule while judicial review proceeds, 5 U.S.C. § 705, in order to maintain these carefully crafted human health protections against toxic pesticide exposure.

## STATUTORY OVERVIEW

FIFRA is "a comprehensive scheme for the registration and regulation of pesticides, the purpose of which is to 'protect man and his environment.'" *Merrell v. Thomas*, 608 F. Supp. 644, 647 (D. Or. 1985), *aff'd*, 807 F.2d 776 (9th Cir. 1986) (citing S.Rep. No. 92-838. 92d Cong., 2d Sess. 1 (1972), U.S. Code Cong. & Admin. News 1972, p. 3993); *see N.Y. State Pesticide Coal., Inc. v. Jorling*, 874 F.2d 115, 117 (2d Cir. 1989) ("By the early 1970s, mounting public anxiety over the effect on the environment of the use of these poisons led Congress to revise FIFRA . . . into a comprehensive scheme to regulate the use, sale and labeling, of pesticides. . . ."). FIFRA requires that EPA determine for each registered pesticide that, "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D). "Unreasonable adverse effects on the environment" are defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* § 136(bb).

Congress intended this language to require EPA to prevent exposures both to workers and to others. Indeed, the "entire purpose of the [1970 FIFRA revisions, known as the Federal Environmental Pesticide Control Act ("FEPCA")] is to protect man and the environment," and farmers and farmworkers are "the most obvious object of th[at] bill's protection." *Organized*

*Migrants in Cmty. Action, Inc. v. Brennan*, 520 F.2d 1161, 1168–169 (D.C. Cir. 1975) (quoting

S. Rep. No. 92-838, at 43–44 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3993, 4063). At the time

of FEPCA's passage, one Senate Committee asserted that FEPCA "provides complete safeguards

to protect farmers and others coming into contact with pesticides or residues." *Id*. at 1168.

## BACKGROUND

Farmworkers are at high risk of pesticide poisoning, and one of the most common

contributors to farmworker exposure is off-target drift that occurs when a sprayed pesticide

moves beyond its intended target. Communities and families situated in close proximity to

agricultural operations are also at risk from pesticide poisoning due to drift. Homes, schools, and

community spaces are often located right next to agricultural properties. The AEZ provides an

important protection for families and children in these areas. *See* Comments of Alianza Naciónal

de Campesinas, et al., Docket ID No. EPA-HQ-OPP-2017-0543-0136 at 9–16 (Jan. 30, 2020)

("Farmworker Comments") (filed with Complaint as Exhibit 2) (providing photos and

descriptions of communities living and working adjacent to pesticide application areas).

## I. AGRICULTURAL WORKER PROTECTION STANDARD AND PROMULGATION OF THE AEZ

Under the authority of FIFRA, EPA protects workers and bystanders from pesticide

exposure in two ways. First, "EPA includes product-specific use instructions and restrictions on

individual pesticide product labeling." Final Rule at 68,762. EPA evaluates the particular risks

attributable to the pesticide product at issue and places requirements (which are printed on the

pesticide label) on its use to protect people and the environment from unreasonable adverse

effects. *See id.* Second, EPA relies on the WPS, which contains general requirements with which

workers, handlers, and their employers must comply and that apply to use of all agricultural

pesticides. EPA intended the WPS "to expand protections against the risks of agricultural

pesticides without making individual product labeling longer and much more complex" and to "complement the product-specific labeling restrictions and . . . to minimize occupational exposures generally." *Id.*

In the late 1990s, EPA realized that existing protections were not sufficient to prevent pesticide poisonings, particularly those from drift. To address this problem and further ameliorate pesticide harm, in 2015, EPA revised the WPS to expand protections. It added a new provision, the AEZ, defined as follows:

> (i) The application exclusion zone is the area that extends 100 feet horizontally
> from the application equipment in all directions during application when
> the pesticide is applied by any of the following methods:
>> (A) Aerially.
>> (B) Air blast application.
>> (C) As a spray using a spray quality (droplet spectrum) of smaller than
>> medium (volume median diameter of less than 294 microns).
>> (D) As a fumigant, smoke, mist, or fog.
> (ii) The application exclusion zone is the area that extends 25 feet horizontally
> from the application equipment in all directions during application when
> the pesticide is applied not as in § 170.405(a)(1)(i)(A)-(D) and is sprayed from a
> height of greater than 12 inches from the planting medium using a spray quality
> (droplet spectrum) of medium or larger (volume median diameter of 294 microns
> or greater).
> (iii) There is no application exclusion zone when the pesticide is applied in a
> manner other than those covered in paragraphs (a)(1)(i) and (a)(1)(ii) of this
> section.

40 C.F.R. § 170.405(a)(1)(i–iii). The AEZ provision provided:

> During any outdoor production pesticide application, the agricultural
> employer must not allow or direct any worker or other person, other than an
> appropriately trained and equipped handler involved in the application, to enter or
> to remain in the treated area or an application exclusion zone that is within the
> boundaries of the establishment until the application is complete.

*Id.* § 170.405(a)(2). Furthermore, handlers "must immediately suspend a pesticide application if any worker or other person, other than an appropriately trained and equipped handler involved in the application, is in the application exclusion zone." *Id.* § 170.505(b).

Prior to the promulgation of the AEZ, there were two main provisions that provided protection during pesticide application: (1) a prohibition on allowing or directing any worker to enter or remain in a treated area (including areas being treated), and (2) a general "do not contact" provision that states that "[t]he handler employer and the handler shall assure that no pesticide is applied so as to contact, either directly or through drift, any worker or other person, other than an appropriately trained and equipped handler." 40 C.F.R. § 170.210(a); *see* Pesticides; Agricultural Worker Protection Standard Revisions, 80 Fed. Reg. 67,496, 67,520– 21 (Nov. 2, 2015) ("2015 Rule"). After reviewing numerous cases of workers' being sprayed, EPA concluded that the protections in place were insufficient, noting that "experiences such as those of workers having to move to get out of the way of the tractor that was applying pesticide . . . and workers being directly sprayed confirm EPA's position that additional protections are necessary during pesticide applications on farms and in forests." 2015 Rule at 67,522; *see also* Decl. of William Jordan ¶¶ 5, 8.

When deciding to add the AEZ as a necessary protection against pesticide poisoning, EPA relied on a substantial body of evidence, including studies and personal accounts of workers and bystanders being sprayed by pesticide drift. EPA cited to numerous comments in the administrative record "where workers or bystanders reported being contacted by pesticides that were being applied," in addition to three studies on pesticide exposure. 2015 Rule at 67,520; *see also* Decl. of William Jordan ¶ 7.  One study found that, between 1998 and 2005, there were 1,942 separate events where agricultural workers were exposed to pesticides. *See* 2015 Rule at 67,520–521; *see also* Geoffrey M. Calvert et al., *Acute Pesticide Poisoning Among Agricultural Workers in the United States, 1998-2005*, 51 Am. J. Indus. Med. 883, 888 (2008), Decl. of Carrie Apfel Ex. 1. The authors determined agricultural workers have an elevated risk for acute

pesticide poisoning compared to other industries, Calvert et al. (2008) at 893, and found the most common factor related to pesticide exposure was off-target drift from nearby application. *Id.* at 891.

Edward J. Kasner et al., *Gender Differences in Acute Pesticide-Related Illnesses and Injuries Among Farmworkers in the United States, 1998-2007*, 55 Am. J. Indus. Med. 571 (2012), Decl. of Carrie Apfel Ex. 2, also cited by EPA, *see* 2015 Rule at 67,520–521, considered 3,646 cases of acute pesticide illness and injury to agricultural workers, of which 2,534 were to farmworkers. *See* Kasner et al. (2012), at 574. This study too found that the most commonly identified contributing factor was exposure to off-target drift. *Id.* at 575.

The third study EPA referenced in 2015 is Soo-Jeong Lee et al., *Acute Pesticide Illnesses Associated with Off-Target Pesticide Drift from Agricultural Applications*, 119 Env't Health Persp. 1162 (2011), Decl. of Carrie Apfel Ex. 3; *see* 2015 Rule at 67,520–521. The study authors identified 643 events and 2,945 illness cases associated with pesticide drift from agricultural applications, including both occupational and nonoccupational cases. *See* Lee et al., (2011) at 1163. Based on their findings, they estimate that 14–24% of total occupational pesticide poisoning may be attributed to off-target drift. *Id.* at 1166. Meanwhile, over half of the drift-related cases were nonoccupational, and residents of agriculture-intensive regions in California had a 69 times higher risk of pesticide poisonings from drift. *Id.* at 1167. Children were at the highest risk among nonoccupational cases. *Id.* at 1167. The study found many cases of drift exposure beyond the boundaries of the establishment, including on private residences (44.5%), on roads or right-of-ways (5.6%), and on school property (3.6%). *Id.*

Based on this evidence, EPA concluded that people were being sprayed by pesticides despite the long-standing "do not contact" provision, and that additional protections were

necessary. *See* 2015 Rule at 67,521; Decl. of William Jordan ¶¶ 5, 7, 8. It concluded that "the AEZ was necessary," that "[w]ithout this new protection, unacceptably large numbers of workers and bystanders would continue to be sprayed with dangerous pesticides." *Id*. ¶ 13. It thus implemented the AEZ and designed it to extend beyond the boundaries of the agricultural establishment, finding that "[o]ut of 17 incidents identified in the comments, only one would have been prevented if the application exclusion zone was limited to the boundaries of the agricultural establishment. . . ." 2015 Rule at 67,524. The AEZ provision went into full effect in January 2018.

## II.    AEZ ROLLBACK RULE

On November 1, 2019, EPA published a proposal to rollback provisions of the AEZ. *See* Final Rule. Farmworkers submitted detailed comments in opposition. *See* Farmworker Comments. In these comments, Farmworkers provided evidence that pesticide exposures were continuing to occur, *i.e.*, the factual circumstances were no different than they were when EPA promulgated the AEZ in 2015, finding it a "necessary" measure to protect against pesticide exposure. *See* Decl. of William Jordan ¶ 13. Farmworkers cited numerous first-hand accounts, since 2015, of bystanders and farmworkers being sprayed by pesticides through drift and, in some cases, experiencing serious health impacts as a result. Farmworkers also included information about 117 cases reported by the California Department of Pesticide Regulation as recently as 2016 (before the AEZ went into effect) where bystanders were made ill as a result of exposure to pesticides from drift. *See* Farmworker Comments at 23–26.

In addition, Farmworkers submitted new studies that supported increasing the distance of the AEZ's radius—not weakening it. For example, a study by Edward J. Kasner et al. took samples downwind in an apple orchard sprayed by an axial fan airblast sprayer. *See* Edward J.

Kasner et al., *Spray Drift from a Conventional Axial Fan Airblast Sprayer in a Modern Orchard Work Environment*, 62 Annals Work Exposures & Health 1134 (2018), Decl. of Carrie Apfel Ex. 4. Drift was measured as far as 52 meters downwind, 1.7 times farther than the AEZ's 30 meters (approximately 100 feet). *Id.* at 1143. A study by Magali N. Blanco et al., examining pesticide drift in an orchard, found significant amounts of drift at all measured distances, from 16 to 74 meters. *See* Magali N. Blanco et al., *Real-time Particle Monitoring of Pesticide Drift from an Axial Fan Airblast Orchard Sprayer*, 29 J. Exposure Sci. & Envtl. Epidemiology 397, 402 (2019), Decl. of Carrie Apfel Ex. 5. The authors concluded: "the current AEZ may not completely protect workers from nearby drift." *Id.*  Dr. Richard Fenske, an author on both of these studies, also submitted comments on the proposed rule urging EPA to keep in place the AEZ provisions to reduce incidences of pesticide exposures. *See* Comments of Richard Fenske, PhD, MPH, Docket ID No. EPA-HQ-OPP-2017-0543-0115 (Jan. 29, 2020), Decl. of Carrie Apfel Ex. 6.

EPA received 126 unique comments on the proposed rollback. Of these, 110 opposed the changes to the AEZ, noting the increased risk of pesticide poisoning posed by the amendment and the lack of justification for it. *See, e.g.*, Comments of Southern Migrant Legal Services, Docket ID No. EPA-HQ-OPP-2017-0543-0114 (Jan. 30, 2020), Decl. of Carrie Apfel Ex. 7; Comments of the Child Labor Coalition, Docket ID No. EPA-HQ-OPP-2017-0543-0109 (Jan. 27, 2020), Decl. of Carrie Apfel Ex. 8.

In spite of this clear message from commenters, including directly impacted stakeholders, EPA finalized the proposal with few changes on October 30, 2020. The Final Rule implements the following revisions to the WPS as relevant to the underlying lawsuit and Plaintiff's proposed Order. *First*, it limits the AEZ protections to the boundaries of the agricultural establishment,

despite the fact that pesticide drift does not stop at property lines. *See* Final Rule at 68,781–782. *Second*, it allows pesticide handlers to make or resume an application despite the presence of someone within the AEZ who is not employed by the establishment and who is in an area subject to an easement. *Id. Third*, it eliminates language and criteria pertaining to spray quality, droplet size, and volume median diameter and instead establishes a uniform 25-foot AEZ for all sprayed applications made from a height greater than 12 inches (which reduces the AEZ to 25 feet from 100 feet for many applications).  *See* Final Rule at 68,781.

## STANDARD FOR ISSUANCE OF A TRO AND PRELIMINARY INJUNCTION AND/OR A STAY OF THE EFFECTIVE DATE

In order to obtain a preliminary injunction, the moving party must show "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). Because the government is a party to the suit, "the final two factors merge." *Id.* at 59. The standard for grant of a temporary restraining order is the same. *See HarperCollins Publishers L.L.C. v. Gawker Media LLC*, 721 F. Supp. 2d 303, 306 (S.D.N.Y. 2010).

The APA further authorizes courts reviewing agency actions to, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, . . . issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Courts employ the same four-part test to determine when to issue a stay under the APA as they do to determine when to issue a preliminary injunction. *See* 969 F.3d at 59.

10

## ARGUMENT

Plaintiffs meet each of the requirements necessary to temporarily enjoin the Final Rule and/or to stay its effective date. Given the necessity of the core protections lifted by the Final Rule and the arbitrary nature of the decisionmaking, Plaintiffs are likely to suffer irreparable harm absent a stay and likely to succeed on the merits once judicial review goes forth. The balance of equities and the public interest also favor keeping the AEZ in place during the pendency of this litigation.

## I.     IF THE FINAL RULE GOES INTO EFFECT, THEN FARMWORKERS, THEIR MEMBERS, AND OTHER BYSTANDERS WILL SUFFER IRREPARABLE HARM.

Farmworkers will be irreparably harmed if the Final Rule goes into effect. To make the required showing of irreparable harm, the moving party must establish that "absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66–67 (2d Cir. 2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)). If the Final Rule goes into effect, Farmworkers and their members will be at increased risk of exposure to pesticide drift and the numerous health impacts that follow. This suffices for a showing of irreparable harm.

Courts have repeatedly found that "irreparable harm exists where, as here, petitioners 'face imminent risk to their health, safety, and lives.'" *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) (quoting *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)). Indeed, injury to Farmworkers and their families' health is exactly the type of injury "for which a monetary award

cannot be adequate compensation." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). For example, in *National Association of Farmworkers Organizations v. Marshall*, the D.C. Circuit preliminarily enjoined agency action that would allow children to work as hand harvesters on the basis that children would "be exposed to … pesticides and chemicals" and that constituted irreparable harm. 628 F.2d 604, 613–14 (D.C. Cir. 1980). The Court noted: "The risk of harm from such exposure *pendente lite* would not be eliminated even if [plaintiffs] ultimately were to win on the merits. Thus, [plaintiffs] convincingly make out a case of irreparable harm, absent interlocutory relief." *Id.* (citations omitted).

For these same reasons, Farmworkers and their members will suffer irreparable harm in the absence of a preliminary injunction or stay. As explained *supra*, numerous studies have documented that farmworkers are particularly at risk for acute pesticide poisoning (with one determining the incidence rate to be thirty-nine times the rate of those in other occupations), *see* Calvert et al., (2008) at 893, and that off-target drift is most often responsible for such exposures (accounting for 63% of cases in one study). *Id.* at 891. The Final Rule removes a requirement for pesticide application to immediately halt in certain circumstances where people are too near the application to be deemed safe from exposure, and thus increases the threat of imminent harm to farmworker and rural communities.

Farmworkers and their members know the risks to their community all too well. As documented thoroughly in the Farmworker Comments through photographs, personal accounts, videos, and reference to state databases that catalogue pesticide exposures, contact with pesticides and the health harms that follow continue to be an everyday threat for these communities. *See* Farmworker Comments at 9–16, 23–27.  For example, photos show farmworker housing in Georgia directly next to a field being actively sprayed, *id.* at 24; an

account from workers in Nebraska explains they were detasseling a corn field when a plane began spraying pesticides on a neighboring field, and they ran for shelter to their bus but many still developed symptoms like nausea, rashes, and itchy noses and throats, *id.* at 25; and a news article reported an incident where two dozen farmworkers working in a hops field were sprayed by a plane making a pesticide application to an onion field across the road, 82 feet away, resulting in many of them becoming ill, *id.* at 26.

Farmworkers' members are particularly vulnerable to pesticide exposure because of their occupations and where they live, and many have experienced exposures in the past. *See* Decl. of Eriberto Fernandez ¶¶ 11–13; Decl. of Teresa Romero ¶¶ 10–11 ; Decl. of Jessica Culley ¶¶ 10–11; Decl. of Reyna Lopez ¶¶ 6, 9; Decl. of Mily Trevino-Sauceda ¶¶ 10–11; Decl. of Nezahualcoyotl Xiuhtecutli ¶¶ 8–9. EPA recognized this when determining that the AEZ was a necessary protection against pesticide poisoning. *See* Decl. of William Jordan ¶ 6.

In addition to being exposed at work, farmworkers and their families also face risks at home. Many farmworkers live—along with their children—in housing that can be "only a few feet from fields where pesticides are sprayed," where they are vulnerable to pesticide drift even while indoors. Decl. of Reyna Lopez ¶ 6. *See* Decl. of Mily Trevino-Sauceda ¶ 10; Decl. of Teresa Romero ¶ 10. Farmworkers have little ability to protect themselves and their families from exposure, as "they receive no notification when pesticides will be sprayed near them." Decl. of Reyna Lopez ¶ 6; *see* Decl. of Mily Trevino-Sauceda ¶ 11. Farmworkers are not the only ones at risk: Plaintiffs and their members also worry about the impact the Final Rule will have on their children attending schools next to fields where pesticides are sprayed. *See* Decl. of Reyna Lopez ¶ 8.

The consequences of this reality are harsh. Pesticide exposure can result in a range of adverse health impacts. Amy Liebman, Director of Environmental and Occupational Health for Plaintiff Migrant Clinicians Network, explains:

> On the mild end of the spectrum, victims of acute exposure may experience nausea, vomiting, skin rashes, and/or eye irritation. Acute exposure may also result in severe symptoms such as convulsions and even death. Studies also show that on the more severe end of the spectrum, victims of chronic exposure can experience long-term neurological damage and can develop different types of cancer. Long term exposure can also cause reproductive issues, resulting in outcomes as severe as sterilization.

Decl. of Amy Liebman ¶ 12. Anecdotally, Farmworkers and their members have heard of farmworkers experiencing terrible, life-altering injuries as a result of exposure, including a farmworker "losing her sight and experiencing severe kidney failure," Decl. of Mily Trevino-Sauceda ¶ 11. Farmworker women who were exposed while pregnant have experienced miscarriages and severe pregnancy complications. *Id.* These are all harms for which no relief could subsequently be provided.

The AEZ provides some protection against this constant threat by mandating pesticide applicators be aware of their surroundings and suspend spraying if someone is close enough to be vulnerable to exposure from drift. With the Final Rule, however, this added protection will be lost for those who are within a mere 100 feet or less, but just beyond the property lines. This poses an imminent threat to the health and safety of farmworkers by increasing their chance of exposure to toxic pesticides and health-harming injury. *See* Decl. William Jordan ¶ 14.

## II.    FARMWORKERS ARE LIKELY TO SUCCEED ON THE MERITS.

Farmworkers are likely to prevail in their challenge to the Final Rule because it violates both FIFRA and the APA. EPA promulgated the Final Rule despite its violating FIFRA's core

mandate to prevent unreasonable risks to human health and despite its being unsupported by the administrative record, in violation of the APA.

### A. The Final Rule Violates FIFRA Because the AEZ Is Necessary to Prevent Unreasonable Adverse Effects from Pesticides

Under FIFRA, EPA must limit the use of a pesticide "[t]o the extent necessary to prevent unreasonable adverse effects," 7 U.S.C. § 136a(a), which are defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* § 136(bb). EPA must support decisions it makes under the authority of FIFRA with "substantial evidence when considered on the record as a whole." *Id.* § 136n(b).

When EPA updated the WPS in 2015 by promulgating a new suite of protections, it "intended [the regulation] to prevent unreasonable adverse effects of pesticides among workers, handlers and other persons who may be on or near agricultural establishments, including vulnerable groups, such as minority and low-income populations." 2015 Rule at 67,496. The Final Rule weakens the AEZ, which was a key component of the 2015 reform, through multiple provisions, without providing countervailing protections, and thus unlawfully allows pesticide use to cause unreasonable adverse effects to workers and bystanders.

At the time of its adoption, EPA established with record evidence that the AEZ was "necessary to prevent unreasonable adverse effects," 7 U.S.C. § 136a(a); *see* Decl. of William Jordan ¶ 13. Evidence in the record continues to support that finding, including the Calvert et al., (2008), Kasner et al., (2012), and Soo-Jeong Lee et al., (2011) studies—the original three studies EPA relied on when promulgating the AEZ in 2015, *see* 2015 Rule at 67,521—as well as numerous accounts of workers and bystanders being exposed to pesticides, including in situations where extending the AEZ beyond the establishment would have protected them from

exposure. *See* Farmworker Comments at 23–26. And it includes studies by Blanco et al., (2019) and Kasner et al., (2018), showing that pesticide drift is prone to travel even farther than the 100 feet provided for in the AEZ (providing strong evidence that bystanders on neighboring properties are at risk). *See* Blanco et al., (2019) at 402; Kasner et al., (2018) at 1143.; *see also* Comments of Richard Fenske, PhD, MPH, Docket ID No. EPA-HQ-OPP-2017-0543-0115 (Jan. 29, 2020).

This evidence leaves no doubt that, without the AEZ extending the full 100 feet over boundaries and within easements, farmworkers will continue to be sprayed by pesticides, most commonly due to off-target drift. *See, e.g.*, Calvert et al., (2008) at 891; Kasner et al., (2012) at 575; Soo-Jeong Lee et al., (2011) at 1162. Farmworkers and bystanders being directly sprayed by pesticide drift is clearly an "unreasonable risk" especially since, as EPA concedes, "EPA's risk assessments and registration decisions presume that no workers or other persons are being sprayed directly." Final Rule at 68,767. William Jordan, former Deputy Director for Programs in EPA's Office of Pesticide Programs, who oversaw the 2015 WPS rulemaking and is thus familiar with the record, states that without the AEZ in place, "if EPA were to evaluate such exposures when assessing the risks posed by pesticide use, EPA would find many pesticides no longer meet FIFRA's safety standard." Decl. of William Jordan ¶ 13.

Because EPA's previous record established the AEZ was needed to avoid "unreasonable risk," EPA cannot now weaken the AEZ and return to an unlawful regulatory regime that fails to provide sufficient protection. EPA arbitrarily claims that it "does not anticipate a change in the protections provided by WPS to the people in the easements because the handler must still apply the pesticide in a way that does not contact them, either directly or through drift" and that "[a]dditional exposure is unlikely to occur, because people would only be contacted by an

application if the applicator were to violate the 'Do Not Contact' requirements." EPA, *Cost Analysis for Revisions to the Application Exclusion Zone in the Agricultural Worker Protection Standard; Final Rule* 10–11 (October 2020) ("Cost Analysis"), Decl. of Carrie Apfel Ex. 9. But this reasoning does not hold water. Asserting that the "do not contact" requirement prevents unreasonable risk to bystanders ignores ample evidence to the contrary and EPA's own prior conclusion that there was "a need to supplement the 'do not contact' performance standard because exposure to drift or direct spray events still happen" 2015 Rule at 67,524; Decl. of William Jordan ¶ 13.

EPA has not—and indeed cannot—show by substantial evidence that weakening the AEZ will not result in unreasonable risk to bystanders. To the contrary, as explained *supra*, record evidence demonstrates there is an ongoing threat to workers and bystanders of exposure to pesticides through drift, including off-site drift. Under FIFRA, EPA is required to eliminate the unreasonable risk to human health. By failing to do that, and instead removing a protection that was key to preventing unreasonable risk to human health, EPA violated FIFRA when it published the Final Rule.

**B.      EPA Violated the APA by Failing to Engage in Reasoned Decision-Making**

Not only does the Final Rule violate FIFRA, but it also violates the APA, which prohibits an agency from acting in a manner that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Settled principles of administrative law require that an agency "must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Consistent with that standard,

when an agency reverses its position on a policy choice—as EPA does so here—it must "display awareness that it *is* changing position," *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and it must provide a "reasoned explanation. . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. When the "new policy rests upon factual findings that contradict those which underlay its prior policy" the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id*. at 515.

In the Final Rule, EPA violated the APA in two ways. First, EPA completely reversed, without explanation or acknowledgement, its 2015 finding that the "do not contact" provision was insufficient to protect bystanders. Second, EPA arbitrarily undervalued the benefits of the full AEZ provision – documented benefits that it reasonably relied on in its 2015 rulemaking.

### 1.    EPA's New Assertion that the "Do Not Contact" Provision Adequately Protects Farmworkers Lacks Reasoned Explanation

EPA's justification for the Final Rule rests on the unfounded premise that even in the absence of the AEZ, "the goal to prevent pesticide from contacting others will continue to be met through required WPS training, including training on how to comply with the 'Do Not Contact' requirement." *See* Final Rule at 68,769. This directly contradicts what EPA found in 2015—on a substantially similar record—when it "identified a need to supplement the 'do not contact' performance standard because exposure to drift or direct spray events still happen . . .  and EPA's risk assessments and registration decisions presume that no workers or other persons are being sprayed directly." 2015 Rule at 67,524; *see also* Decl. of William Jordan ¶ 13**.**

In violation of APA requirements, EPA reverses its determination without reasoned explanation or any new supporting facts, seemingly as part of an impermissible effort to deregulate no matter the costs to human health. In March 2017, the Trump Administration

published Executive Order 13,777, *Enforcing the Regulatory Reform Agenda*, to "alleviate unnecessary regulatory burdens." Exec. Order No. 13,777, 82 Fed. Reg. 12,285 (Feb. 24, 2017). It required agencies to form "Regulatory Reform Task Forces" to identify regulations for repeal, replacement, or modification. On April 11, 2017, EPA issued in the Federal Register a request for public comment to identify such regulations. *See* Evaluation of Existing Regulations, 82 Fed. Reg. 17,793-01 (Apr. 13, 2017). In response, it received over 460,000 comments, a handful of which suggested modification and/or revocation of the AEZ provision of the WPS. *See, e.g.*, Comments of NASDA, Docket ID. No. EPA-HQ-OA-2017-0190-56233 (May 15, 2017), Decl. of Carrie Apfel Ex. 10.

In issuing the Final Rule, EPA does not even acknowledge its prior position. Instead, it unconvincingly attempts to re-write its 2015 stance on the "do not contact" provision, claiming, "[t]he AEZ requirement provides an extra measure of assurance that applications will not result in worker or bystander exposure [that] may be considered a redundant protection." Final Rule at 68,768. This mischaracterization is both unsupported and inconsistent with the detailed discussion in the preamble to the 2015 Rule. EPA did not consider the AEZ provision to be "redundant" to the "do not contact" provision but rather a necessary *additional* safety measure to protect against pesticide poisoning. *See* Decl. of William Jordan ¶¶ 8, 13. In 2015, EPA explicitly "disagree[d] with the assertion that the 'do not contact' requirements, along with the other protections on pesticide labels, are by themselves sufficient to protect workers and bystanders." 2015 Rule at 67,521. Because EPA fails to explain how "the facts and circumstances that underlay the prior policy ha[ve] changed, or why the EPA ha[s] chosen to disregard them"—and indeed fails to even recognize its change in position—the Final Rule is

unlawful under the APA. *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 438 F. Supp. 3d 220, 232 (S.D.N.Y. 2020) (internal quotations omitted).

>2.     **EPA's New Cost-Benefit Analysis Violates the APA by Arbitrarily Undercounting Benefits of the Stronger, 2015 AEZ**

Not only does the Final Rule violate the APA by changing position without adequate justification, but it also violates the APA by relying on a flawed cost-benefit analysis that is inconsistent with its reasoned and documented 2015 analysis. Courts have held that: "[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *New York v. U.S. Dep't of Educ.*, No. 20-CV-4260 (JGK), 2020 WL 4581595, at *10 (S.D.N.Y. Aug. 9, 2020) (quoting *Nat'l Ass'n of Home Builders v. Envtl. Prot. Agency*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). Though the plaintiffs' "burden to show error is high," Farmworkers easily meet that burden here because EPA failed to attribute *any* benefits to the AEZ protections. *Id.*

In 2015, EPA found that there were real benefits to the AEZ provision, namely that "the drift-related requirements" would "help reduce the number of exposures of workers and other non-handlers to unintentional contact to pesticide applications." 2015 Rule at 67,525. It concluded, "the benefits of these requirements outweigh the negligible costs." *Id.*; *see also* Decl. of William Jordan ¶ 9. Now, without justification or support, EPA claims "the AEZ imposes burdens that are disproportionate to the need for the extra measure of assurance the AEZ is intended to provide." Final Rule at 68,768. EPA makes this finding only because it inexplicably cannot find "*any increased risk* of pesticide exposure from revising the AEZ requirements." Cost Analysis at 10 (emphasis added), and thus finds no costs associated with the roll back. This flatly contradicts its 2015 analysis, which ably quantified the benefits of the rule to be between

$575,000 and $2.6 million annually.[3] See EPA, *Economic Analysis of the Agricultural Worker Protection Standard Revisions* 128, Docket ID No. EPA-HQ-OPP-2011-0184, Decl. of Carrie Apfel Ex. 11 ("2015 EIA").

Equally problematic, EPA finds the benefits of the revised AEZ outweigh the costs, even as it concedes that weakening the AEZ "is not expected to result in any quantifiable cost savings for farms." Cost Analysis at 10. EPA fails to point to a single concrete example of how an agricultural establishment had been harmed due to compliance with the AEZ.

EPA *may not* "put a thumb on the scale," as it does here, by overturning its previous finding and "undervaluing the benefits and overvaluing the costs of more stringent standards." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008). EPA impermissibly assesses only the alleged benefits of the rollback and ignores completely the costs incurred in increasing bystander exposure to pesticides. EPA's cost-benefit analysis is thus arbitrary and capricious, and cannot stand.

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR A TRO AND/OR PRELIMINARY INJUNCTION OR STAY

Farmworkers also meet the third and fourth prongs of the standard for maintaining the status quo. While Farmworkers will experience irreparable harm to their health, life, and safety if a temporary injunction or stay is not granted, no party—including EPA—will experience anything close to that level of harm if the status quo is maintained, and the public interest will be served by maintaining existing protections against pesticide exposure.

---

[3] At the time, EPA cautioned that this was a "substantial underestimate" due to important non-quantifiable benefits such as farmworkers willingness to pay to avoid illness for themselves and their families, and benefits from avoiding illness associated with chronic pesticide exposure.

The 2015 version of the AEZ provision went into effect almost 3 years ago, in January 2018. There have been no reports—in the record for the Final Rule or otherwise—that agricultural owners suffered business losses from having to temporarily suspend pesticide applications due to a person within the AEZ over whom the owner lacked control. In fact, EPA itself finds that the Final Rule "is not expected to result in any quantifiable cost savings for farms." Cost Analysis at 10.

Similarly, regulated parties' fear that they will be subject to enforcement actions appears to be a purely abstract and theoretical concern. Final Rule at 68,767. There have been no accounts of agricultural owners or employers suffering penalties because they were unable to comply with the AEZ. Indeed, EPA itself notes that "EPA is not aware of any AEZ violation having been enforced without pesticide [] contact occurring first." *Id.* at 68,769. Tellingly, regulated parties did not show widespread support for the Final Rule. EPA shares:

> Of the 126 unique submissions to the docket, approximately 16 commenters submitted comments in support of EPA's efforts to clarify and simplify the AEZ requirements of the WPS, noting that these changes would result in improved enforceability and compliance while maintaining other protections intended to ensure the safety of workers or other persons from contact during pesticide applications.

*Id.* at 68,765. Thus, agricultural owners and employers will not be harmed by a stay.

Finally, States and State enforcement agencies will not be harmed by a stay. The States of New York, California, Illinois, Maryland and Minnesota are challenging the Final Rule because they wish to keep in place protections for their residents. Additionally, in 2017, the PPDC, which includes representation from farmworker groups and state, local, and tribal governments, determined that there were *no* AEZ issues that necessitated revoking or curtailing the provision. *See* EPA, Transcript of PPDC November 2, 2017 Meeting at 80–81 ("It's easy for an applicator

to understand the concept, and it's easy for an applicator to comply with."), Decl. of Carrie Apfel Ex. 12.

Moreover, even if there were some level of enforcement simplification provided by the Final Rule, the public interest in preventing people from being poisoned by pesticides strongly outweighs this interest, and so the public interest favors a stay. Here, where, allowing the Final Rule to go into effect will result in increased pesticide exposure and resulting adverse health outcomes and lost productivity "[t]o say the least, the public interest does not favor the immediate implementation of the Rule." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 86–87. A stay will continue protections for approximately 2.4 million farmworkers nationwide who are at constant risk of pesticide exposure. *See* 2015 EIA at 119 (citing (NASS, 2008b)). A stay will also ensure protection for the many communities sited near agricultural establishments, including children playing outside their homes, or at day care centers and schools that neighbor areas where pesticides are sprayed. *See* Farmworker Comments. Indeed, a stay will lessen the likelihood that farmworkers and their communities are exposed to pesticides via drift and experience adverse health impacts, which can range from "mild skin irritation to more severe effects" that can include "fatigue and dizziness, nausea, cramps and diarrhea, impaired vision . . . seizures, respiratory depression . . . loss of consciousness . . . [and even] death." 2015 EIA at 122. For farmworkers who are pregnant, this means protections against pre-natal exposure, which has been found to affect children's neurological development and has been linked to future childhood leukemia. *Id.* at 124–25.

A stay will preserve the status quo while judicial review is underway, preventing farmworkers and communities from irreparable harm in the form of increased threat of pesticide

poisoning. Meanwhile, no parties will be harmed by the stay. For all these reasons, the balance of equities and public interest strongly tip in favor of granting a stay.

## CONCLUSION

For the foregoing reasons Farmworkers respectfully ask this Court to GRANT their motion for stay of the effective date under the APA, 5 U.S.C. § 705, and/or a temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65.

Respectfully submitted,

/s/Eve Gartner
Eve Gartner
Surbhi Sarang
Kara Goad *(Pro Hac Vice motion to be submitted)*
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
egartner@earthjustice.org
ssarang@earthjustice.org
kgoad@earthjustice.org
(212) 845-7376

Carrie Apfel *(Pro Hac Vice motion to be submitted)*
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
capfel@earthjustice.org
(202) 667-4500

Iris Figueroa *(Pro Hac Vice motion to be submitted)*
Trent Taylor *(Pro Hac Vice motion to be submitted)*
Farmworker Justice
1126 16th St., NW, Suite LL-101
Washington, DC 20036
ifigueroa@farmworkerjustice.org
ttaylor@farmworkerjustice.org
(202) 800-2519

*Counsel for Plaintiffs*

24